TATEL,
Circuit Judge, dissenting from Parts II.B and III.B:
In the mid-1970s, as industrial and technological developments spurred the national economy, the United States faced “a rising tide of scrap, discarded, and waste materials.” 42 U.S.C. § 6901(a)(2). This mounting waste caused “serious financial, management, intergovernmental, and technical problems,” id. § 6901(a)(3), and posed a grave threat “to human health and the environment,” id. § 6901(b)(5). In response, Congress passed the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901-6992k, a comprehensive scheme “to regulate hazardous wastes from cradle to grave in accordance with ... rigorous safeguards and waste management procedures,” Chicago v. Environmental Defense Fund, 511 U.S. 328, 331, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994). Through RCRA, and central to this case, Congress sought to prevent environmental harm by ensuring that hazardous waste was “properly managed in the first instance thereby reducing the need for corrective action at a future date.” 42 U.S.C. § 6902(a)(5).
Congress gave the Administrator of the Environmental Protection Agency (EPA) broad authority to effectuate this goal. See id. § 6912. Selected by the President and confirmed by the Senate for his or her *76 expertise in environmental issues, the Administrator may promulgate “such regulations as are necessary to carry out his [or her] functions.” Id. § 6912(a)(1). The judiciary, by contrast, has a limited role under RCRA. When reviewing rules issued by the Administrator, the courts, lacking environmental expertise and political accountability, are bound by two fundamental principles of judicial restraint.
First, because RCRA provides for review “in accordance with” the Administrative Procedure Act, id. § 6976(a), a reviewing court’s task is to ask only whether the rule is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,” 5 U.S.C. § 706(2)(A). As the Supreme Court has made clear, once a court is satisfied that EPA is acting within its delegated authority, the “scope of [judicial] review under the ‘arbitrary and capricious’ standard is narrow.” Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Courts are “not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives.” FERC v. Electric Power Supply Association, — U.S.-, 136 S.Ct. 760, 782, 193 L.Ed.2d 661 (2016). This is especially true where, as here, agency action involves “a high level of technical expertise,” Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting Kleppe v. Sierra Club, 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (internal quotation mark omitted)), and “predictive judgments about areas that are within the agency’s field of discretion,” BNSF Railway Co. v. Surface Transportation Board, 526 F.3d 770, 781 (D.C. Cir. 2008) (quoting Wisconsin Public Power, Inc. v. FERC, 493 F.3d 239, 260 (D.C. Cir. 2007)).
Second, when reviewing facial challenges to a rule — again as here — courts are required to assess the rule’s validity across a broad spectrum of applications; they are not to imagine whether the rule might be arbitrary in “uncommon particular applications,” which, of course, can be challenged later should they arise. EPA v. EME Homer City Generation, L.P., — U.S.-, 134 S.Ct. 1584, 1609, 188 L.Ed.2d 775 (2014). As Congress well knew when it authorized pre-enforcement facial review of RCRA rules, see 42 U.S.C. § 6976(a)(1), the fact that a petitioner — or for that matter a judge — “can point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule ‘arbitrary or capricious,’ ” American Hospital Association v. NLRB, 499 U.S. 606, 619, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991).
In this case, EPA promulgated a rule defining when hazardous materials qualify as “discarded” and thus may be subjected to RCRA’s rigorous protections. The court never questions the Administrator’s statutory authority to issue the Final Rule, but nonetheless invalidates two of its critical features: Factor 4 of the legitimacy test, which distinguishes genuine from sham recycling; and the verified recycler exclusion, which ensures that companies claiming to recycle hazardous waste in fact do so. In reaching this result, the court displays a level of scrutiny that I believe conflicts with the APA’s highly deferential standard of review and with the principles governing judicial review of facial challenges to rules. As a result, the court has deprived the public of two safeguards that the Administrator, exercising her statutory authority under RCRA, reasonably believed were needed to protect “human health and the environment.” 42 U.S.C. § 6901(b)(5). I respectfully dissent.
*77 I.
Factor 4 of the legitimacy test targets sham recyclers that incorporate hazardous materials into recycled products in order to avoid proper recycling or disposal. It does so by requiring that the product of a recycling process “be comparable to a legitimate product or intermediate.” 40 C.F.R. § 260.43(a)(4). This approach makes sense: as the Administrator explained, “high levels of hazardous constituents” in an allegedly recycled product “could indicate that the recycler incorporated hazardous constituents into the final product when they were not needed to make that product effective.” 80 Fed. Reg. 1,726. The Final Rule offers recyclers three alternative avenues for demonstrating compliance with Factor 4.
First, subparagraph (i) addresses recycled products that have raw analogues. Such products satisfy Factor 4 if they (A) “do[ ] not exhibit a hazardous characteristic ... that analogous products do not exhibit” and (B) contain comparable concentrations of hazardous constituents or hazardous-constituent levels that meet widely used commodity standards. 40 C.F.R. § 260.43(a)(4)(i). In my view, this subparagraph rationally effectuates Factor 4’s general approach. EPA inferred that if a recycled product contains more hazardous constituents or properties than its raw analogue, sham recycling has occurred. 80 Fed. Reg. 1,727. Why else would those hazardous constituents or properties be present? By way of example, EPA pointed to paint made from recycled hazardous materials. If such paint contains significant amounts of cadmium (a hazardous constituent), but the same type of paint made from raw materials contains no cadmium, such a disparity “could indicate that the cadmium serves no useful purpose and is being passed through the recycling process and discarded in the product.” Id.
We validated an almost identical technical judgment by the Administrator in Safe Food and Fertilizer v. EPA, 350 F.3d 1263 (D.C. Cir. 2003). Under the rule in that case, certain recycled materials were deemed non-discarded when (1) market participants treated them “more like valuable products than like negatively-valued wastes” and (2) “the [products] derived from the recycled [materials were] chemically indistinguishable from analogous commercial products made from virgin materials.” Id. at 1269. In essence, this rule exempted materials from regulation based on their compliance with criteria that, like Factors 3 and 4, assess whether recyclers treat materials as valuable commodities and generate products chemically indistinguishable from analogous products. We held that these two factors, in conjunction, represented a “reasonable tool for distinguishing products from wastes.” Id. As to the “identity principle” — subparagraph (i)’s counterpart — the court reasoned that where a recycled product is “indistinguishable in the relevant respects” from the analogous “virgin” product, it is “eminently reasonable” to treat both as “products rather than wastes.” Id.
In spite of Safe Food, this court concludes that subparagraph (i) is too “impre-cis[e]” to be reasonable. Maj. Op. at 59-60. In its view, some legitimately recycled products may contain “some small excess of hazardous constituents,” and the presence of those hazardous materials “would not constitute a reasonable basis for dubbing the product or the process a sham.” Id. But subparagraph (i) does not simply target products with “some small excess of hazardous constituents.” Rather, it targets products with significantly more hazardous constituents or properties than an analogous raw product, i.e., beyond “a small acceptable range” of difference. 80 Fed. Reg. 1,727. The Administrator explained: *78 “If a product produced with hazardous secondary material exhibited a characteristic of hazardous waste that an analogous product did not exhibit, this would be an indication that sham, recycling could be occurring as a significant hazardous constituent or characteristic would be in the product only as a result of the recycling of the hazardous secondary material.” Id. (emphasis added).
Perhaps the presumption underlying subparagraph (i) does suffer from some “imprecision.” Maj. Op. at 59-60. Yet because Industry Petitioners have mounted a facial attack on the Final Rule, this court has no authority to conjure up “hypothetical case[s] in which the rule might lead to an arbitrary result.” American Hospital Association, 499 U.S. at 619, 111 S.Ct. 1539. Where, as here, the Administrator’s presumption of sham recycling based on elevated levels of hazardous constituents is reasonable across most applications, we must uphold it. Id. If someday the Administrator applies the rule to a recycler in an arbitrary and capricious manner — for instance, as the court fears, by selecting an unreasonably “small acceptable range of difference,” see Maj. Op. at 63 that recy-cler “may bring a particularized, as-applied challenge to the [rule],” EME Homer City Generation, 134 S.Ct. at 1609.
The court’s analysis of subparagraph (i) suffers from a second defect. Whether the presence of hazardous constituents provides sufficient evidence of sham recycling is exactly the type of technical judgment that RCRA delegates to the Administrator. Of course, the Administrator “must examine the relevant data and articulate a satisfactory explanation for its action.” State Farm, 463 U.S. at 43, 103 S.Ct. 2856. The court, however, never questions the Administrator’s compliance with these two requirements. Instead, it second guesses the Administrator’s “predictive judgments,” BNSF Railway Co., 526 F.3d at 781, about a matter — the precise level of hazardous constituents needed to demonstrate sham recycling — that “requires a high level of technical expertise” to which “we must defer,” Marsh, 490 U.S. at 377, 109 S.Ct. 1851.
Subparagraph (ii), which applies when a recycled product has no raw analogue, offers recyclers a second way to show compliance with Factor 4. These products qualify as legitimate if they “meet[ ] widely recognized commodity standards and specifications” or if “[t]he hazardous secondary materials being recycled are returned to the original process ... from which they were generated.”- 40 C.F.R. § 260.43(a)(4)(h).
The court concedes that subparagraph (ii) is reasonable, see Maj. Op. at 58-59, and for good reason. The Final Rule describes the agency’s efforts to address commenters’ concerns that in many cases of legitimate recycling “there may not be an analogous product with which a facility can compare the product of the recycling process.” 80 Fed. Reg. 1,728. In response to these concerns, as well as other comments supporting an approach focused on commodity standards and closed-loop recycling, the Administrator carved out “recycling processes that [are] designed to use a specific hazardous secondary material to make a useful product and processes that always incorporate[ ] a hazardous secondary material back into the generating process during manufacturing.” Id.
Finally, subparagraph (hi) — a catchall for recyclers unable to comply with sub-paragraphs (i) or (ii) — allows recyclers to demonstrate legitimacy by showing either a “lack of exposure from ... or bioavaila-bility of ... toxics” in the product. 40 C.F.R. § 260.43(a)(4)(iii). Even if they fail to make either showing, moreover, recyclers can still demonstrate legitimacy by *79 pointing to any “other relevant considerations” showing that the product does not “pose a significant human health or environmental risk.” Id. To make these showings, recyclers must “prepare documentation,” including a “certification statement that the recycling is legitimate,” which “must be maintained on-site for three years after the recycling operation has ceased.” Id.
Although the court acknowledges that subparagraph (iii) reasonably draws the line between recycling and discard through a perspective based on health and environmental risks, Maj. Op. at 61 (citing Safe Food, 350 F.3d at 1269-70), it nonetheless concludes that subparagraph (iii) “falls short of saving the rule, due to the draconian character of the procedures it imposes on recyclers,” namely, the requirement to prove legitimacy by preparing and maintaining “paperwork,” id. at 61-62.
For their part, however, Industry Petitioners never argue that the rule’s paperwork obligations are too rigorous. This is understandable. If subparagraph (iii) qualifies as draconian, then so too would countless other run-of-the-mill requirements that entities file applications and keep certificates on hand: like those for pilots, see 14 C.F.R. § 61.3; id. § 61.123, elevator operators, see D.C. Mun. Regs. tit. 12, § 3010A-3011A, and businesses selling alcohol, see D.C. Code § 25-401; id. § 25-711, just to name a few. Not even the procedures for gaining and maintaining admission to the District of Columbia Bar would pass muster, as they require candidates to prepare a character and fitness application and certify completion of a mandatory course on professional conduct. See D.C. Court of Appeals R. 46; D.C. Bar Bylaws, R. 2.
In any event, the court’s conclusion runs headlong into precedent. In American Chemistry Council v. EPA, 337 F.3d 1060 (D.C. Cir. 2003), we considered a challenge to an EPA rule that presumed certain mixtures and derivatives of waste were “hazardous” and thus subject to regulation, yet permitted regulated entities to show otherwise. Upholding this rule, we concluded that the Administrator acted reasonably in “[pjlacing the burden upon the regulated entity to show the lack of a hazardous characteristic.” Id. at 1065. This burden-shifting approach, we determined, alleviated unmanageable administrative obligations for the agency and comported with RCRA’s command to “err on the side of caution.” Id. at 1065-66.
Subparagraph (iii) works just like the rule we approved in American Chemistry Council. If a recycler is unable to satisfy subparagraph (i) or (ii), it is a presumptive sham recycler. Subparagraph (iii) then allows the recycler to prove otherwise by making the requisite showings through documentation. If anything, the rule here is more lenient than the one in American Chemistry Council because subparagraph (iii) provides for a “self-implementing certification process,” 80 Fed. Reg. 1,730, rather than a “cumbersome ... delisting process,” American Chemistry Council, 337 F.3d at 1065.
According to the court, the Final Rule is unlike the one in American Chemistry Council because the Administrator never demonstrated that recyclers failing to meet subparagraph (i) are presumptively discarding. Maj. Op. at 61-62. At bottom, then, the court’s critique of subparagraph (iii) traces back to its conclusion that sub-paragraph (i) (and only subparagraph (i)) does not reasonably distinguish legitimate from sham recycling. But contrary to the court’s view, EPA cogently explained why subparagraph (i) is reasonable across most applications, adding subparagraph (iii) only given the possibility that “there may still *80 be instances where recycling is legitimate, but is unable to meet” subparagraph (i) or (ii). 80 Fed. Reg. 1,729. Subparagraph (iii) thus serves as a catchall provision designed to give industry even more “flexibility],” id., not as a tacit acknowledgment that subparagraph (i) is deficient, contra Maj. Op. at 60-61. Rather than “substitute [its] own judgment for that of [EPA],” this court should defer to the agency’s technical and policy decisions. Electric Power Supply Association, 136 S.Ct. at 782.
II.
The key difference between the verified recycler exclusion and its predecessor— the transfer-based exclusion — is that the new rule shifts oversight of off-site recyclers from the industry to the Administrator. 80 Fed. Reg. 1,709. Whereas before waste generators audited off-site recyclers to ensure their legitimacy, now the Administrator or a state authority issues a variance confirming that a recycler’s practices are sound. Id. at 1,695.
The court never questions the Administrator’s authority to promulgate this rule. Instead, invoking a single line from Safe Food — “firm-to-firm transfers are hardly good indicia of a ‘discard,’ ” 350 F.3d at 1268 — the court concludes that the Administrator had no basis for finding that transferred hazardous materials “earr[y] an undue risk of discard,” Maj. Op. at 68.
Safe Food, however, held only that transferred materials are not automatically discarded simply because they are sent off-site. As we explained, although “we have never said that RCRA compels the conclusion that material destined for recycling in another industry is necessarily ‘discarded,’ ” the statute “does not preclude application of RCRA to such materials if they can reasonably be considered part of the waste disposal problem.” Safe Food, 350 F.3d at 1268. The verified recy-cler exclusion is consistent with Safe Food: it defines transferred materials as discarded if — and only if — the off-site recycler receiving the materials fails to meet certain criteria, which carefully discern whether allegedly recycled materials “can reasonably be considered part of the waste disposal problem.” Id.
This approach finds ample support in the administrative record. When designing the verified recycler exclusion, the Administrator relied on multiple sources, including a report on market forces in the recycling industry and a study of the environmental problems associated with recycling hazardous secondary materials. 80 Fed. Reg. 1,707. The first of these, the market study, concluded that off-site commercial recyclers, which generate revenue primarily by receiving hazardous materials, have “economic incentives to accumulate waste beyond their ability to deal with it.” Id. The second report, the problems study, found that of 208 cases in which hazardous waste recycling led to serious environmental damage, 94 percent were attributable to “off-site third-party recyclers.” Id.
In the court’s view, neither study justifies the rule. Although not impugning the market study on its merits, the court rejects it as lacking empirical analysis. But no rule of administrative law bars agencies from relying on studies that use economic models to assess market incentives. In fact, EPA often relies on theoretical models — that is, studies without corroborating “data,” Maj. Op at 69 and our court has long held that “[r]easoned decisionmaking can use an economic model to provide useful information about economic realities.” American Public Gas Association v. FPC, 567 F.2d 1016, 1037 (D.C. Cir. 1977); see also Mississippi Commission on Environmental Quality v. EPA 790 F.3d 138, 171 *81 (D.C. Cir. 2015) (“EPA’s application, interpretation and modification of [predictive] modeling [to set emissions standards] plainly fall ‘within its technical expertise’ and thus we owe it ‘an extreme degree of deference.’ ” (quoting ATK Launch Systems, Inc. v. EPA, 669 F.3d 330, 338 (D.C. Cir. 2012))).
At any rate, the problems study provides plenty of empirical support for the conclusion that off-site recycling leads to discard. It surveyed cases since 1982' in which recyclers contaminated the environment by discarding hazardous waste, poisoning soil and groundwater “with remediation costs in some instances in the tens of millions of dollars.” 80 Fed. Reg. 1,707. To identify these cases, EPA reviewed scores of sources, including the Superfund National Priorities List, national and state databases, comments from at least three different rulemakings, media reports, and information gleaned from contacts in EPA regional offices and state agencies. See EPA Office of Resource Conservation and Recovery, An Assessment of Environmental Problems Associated with Recycling of Hazardous Secondary Materials 4 (2014). This thorough canvassing revealed that a full 94 percent of cases involving serious environmental damage could be attributed to off-site recycling.
The court condemns the problems study for “focus[ing] only on recycling gone wrong.” Maj. Op. at 69-70. As a result, the court reasons, the study “tells us nothing” about the relative risks of off-site recycling or the total damage caused by off-site recyclers. Id. But this focuses on the wrong question. As the Administrator recognized, the salient question is not what percentage of all off-site recycling damages the environment, but rather what portion of serious damage from hazardous waste disposal is caused by off-site recyclers. The core issue here is whether EPA may target the very companies (off-site recyclers) most responsible for environmental damage. Given the agency’s statutory obligation to prevent environmental harm from discarded hazardous waste, I see no reason why it cannot. Accordingly, that some off-site recycling is safe or that serious environmental damage is relatively unusual is beside the point.
Consider this issue in a different context. If there were 208 plane crashes and 94 percent were linked to one carrier, it would be eminently reasonable for an agency tasked with preventing plane crashes to require that carrier to demonstrate that its practices were safe, no matter how many flights the carrier completed or what percentage of total flights it performed. Contra Maj. Op. at 69-70. No one would argue that it was unreasonable to regulate the carrier because only a small percentage of its total flights crashed. Yet this court’s approach would yield just that result.
In the end, the fundamental problem with the court’s conclusion — that the Administrator needs more proof that off-site recycling is unsafe before requiring a variance — is that the court decides for itself a policy question Congress left to the Administrator. RCRA envisions a careful balance of authority between EPA and this court. Today the court upsets that balance.