# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 9, 2019            Decided July 2, 2019

No. 18-1163

CALIFORNIA COMMUNITIES AGAINST TOXICS, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND ANDREW
WHEELER, ADMINISTRATOR, U.S. ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

AMERICAN CHEMISTRY COUNCIL, ET AL.,
INTERVENORS

On Petition for Review of Administrative Action
of the United States Environmental Protection Agency

*Khushi Desai* argued the cause for petitioners. With her on the briefs was *James S. Pew*.

*Perry M. Rosen*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, and *Jonathan Brightbill*, Deputy Assistant Attorney General.

2

*Thomas Sayre Llewellyn* argued the cause for intervenor-respondents. With him on the brief were *Stacy R. Linden*, *Matthew A. Haynie*, *Richard S. Moskowitz*, *Wayne J. D'Angelo*, *Peter C. Tolsdorf*, *Timothy K. Webster*, *Leslie A. Hulse*, *Aaron J. Wallisch*, *Kevin A. Gaynor*, *John P. Elwood*, and *Jeremy C. Marwell*. *Joshua S. Johnson* entered an appearance.

Before: HENDERSON and ROGERS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:   In 1976, Congress enacted the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, 42 U.S.C. §§ 6901–6992k, to address the environmental and health risks associated with hazardous solid waste.   Subtitle C of RCRA required the Environmental Protection Agency to issue regulations governing the storage, treatment, and disposal of "solid waste," which was defined as "discarded" material, 42 U.S.C. § 6903(27).   Among RCRA's stated objectives was "minimizing the generation of hazardous waste . . . by encouraging process substitution, materials recovery, *properly conducted recycling* and reuse, and treatment."  *Id.* § 6902(a)(6) (emphasis added).  In 2008, EPA promulgated a final rule that treated material transferred from a waste generator to a third-party reclaimer as legitimately recycled, rather than "discarded" and subject to Subtitle C regulation, if several conditions were met.   This Transfer-Based Exclusion was replaced by another exclusion in 2015, reinstated by the court in 2017, and reissued by EPA as modified in 2018.

Environmental petitioners consider the Transfer-Based Exclusion to be insufficiently protective of human health and the environment and bring two challenges: First, they contend

the Transfer-Based Exclusion exceeds EPA's statutory authority under RCRA.  In their view, a generator "discards" hazardous material whenever it pays a reclaimer to accept the material.  Second, they contend the Transfer-Based Exclusion fails arbitrary and capricious review because EPA has not provided a reasoned explanation for treating hazardous material differently based on whether it is sent to a reclaimer instead of a storage, treatment, or disposal facility, and because EPA has already identified deficiencies in the Transfer-Based Exclusion.

EPA initially raises a host of threshold objections to petitioners' contentions, some of which industry intervenors join.  Upon examination, we conclude none is persuasive.  On the merits, EPA responds that neither the statutory text, case law, nor empirical data supports petitioners' contentions.  We conclude, in view of this court's precedent, that EPA did not act contrary to RCRA in adopting the Transfer-Based Exclusion because hazardous secondary materials are not necessarily "discarded" each time they are transferred from a generator to a reclaimer along with payment.  Further we conclude that EPA has provided a reasoned explanation for applying different standards to materials that are not yet part of the waste disposal problem RCRA addresses where they meet conditions EPA concluded were adequate for safe transfer and legitimate recycling.  The Transfer-Based Exclusion therefore survives arbitrary and capricious review.  Accordingly, we deny the petition for review.

## I.

Some background is necessary before addressing the threshold objections to petitioners' challenge.

4

**A.**

In 2008, EPA promulgated a final rule intended to "encourage and expand the safe, beneficial recycling of additional hazardous secondary materials," adopting the Generator-Controlled Exclusion and the Transfer-Based Exclusion. The Exclusions deal with "reclamation," a type of recycling that occurs when secondary material is processed to recover a usable product or is regenerated. 40 C.F.R. § 261.1(c)(4), (7). Secondary materials can include byproducts, spent materials, and sludges. *Id.* § 261.1(c)(1)–(3). The final rule allowed generators of hazardous secondary materials to avoid Subtitle C regulation of those materials where the generator controls the recycling or where the generator transfers the materials to an off-site reclaimer. *Revisions to the Definition of Solid Waste*, 73 Fed. Reg. 64,668, 64,669 (Oct. 30, 2008) ("2008 Rule"). Under the Transfer-Based Exclusion, generators, transporters, and reclaimers must meet "Transfer Conditions" to ensure hazardous materials are transferred securely and are actually recycled. *Id.* at 64,669–70. For example, a generator must audit the reclaimer for compliance with proper recycling practices. *Id.* at 64,683. "Legitimacy Factors" must also be satisfied so recycling is legitimate and not a "sham." *Id.* at 64,670. The history of the Rule is described in *American Petroleum Institute v. EPA* ("*API III*"), 862 F.3d 50 (D.C. Cir. 2017).

Suffice it to say, environmental groups challenged the 2008 Rule as too lenient, and industry groups challenged the Rule as too strict. EPA eventually replaced the Transfer-Based Exclusion in 2015 with a similar but more restrictive Verified Recycler Exclusion, allowing generators to avoid Subtitle C requirements only when they transfer materials to verified recyclers that had obtained either permits or variances. *Definition of Solid Waste*, 80 Fed. Reg. 1694, 1695 (Jan. 13, 2015) ("2015 Rule"). Environmental and industry groups

challenged this Exclusion, and in *API III*, the court vacated the permit and variance provisions, reinstated the 2008 Transfer-Based Exclusion, and upheld other requirements regarding emergency preparedness and containment added in 2015. On rehearing, the court expanded the Transfer-Based Exclusion to cover spent refinery catalysts. *American Petroleum Institute v. EPA* ("*API IV*"), 883 F.3d 918 (D.C. Cir. 2018). Without further notice and comment, EPA then published in 2018 the Transfer-Based Exclusion as modified by this court, which petitioners now challenge. *Response to Vacatur of Certain Provisions of the Definition of Solid Waste Rule*, 83 Fed. Reg. 24,664 (May 30, 2018) ("2018 Rule"). The court is presented with an unusual time warp in considering petitioners' challenges to the Transfer-Based Exclusion given the passage of 10 years during which EPA considered policy concerns and the court addressed legal challenges.

**B.**

The court first must address the threshold objections raised by EPA and joined in part by industry intervenors.

**1. Standing.** To satisfy "the irreducible constitutional minimum of standing," a party must establish (1) that it has "suffered an injury in fact" that is both "concrete and particularized" and "actual or imminent," (2) that the injury is "fairly trace[able] to the challenged action of the defendant," and (3) that the injury is "likely . . . [to] be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (first alteration in original). Contrary to EPA's objection, petitioners have established standing.

For an organization to bring suit on behalf of its members, it must show (1) at least one of "its members would otherwise have standing to sue in [his or her] own right," (2) "the interests it seeks to protect are germane to the organization's purpose,"

and (3) "neither the claim asserted nor the relief requested requires the participation of individual members." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013). Petitioners' members live, commute, work, and recreate near generators of hazardous materials that used the Transfer-Based Exclusion before 2015 or that are likely to use it now. *See* Feldman Decl. ¶¶ 3–4; Ford Decl. ¶ 3; Kilgour Decl. ¶¶ 5–7; Rhodes Decl. ¶¶ 2–3. By parity of reasoning, just as the court has recognized industry groups' standing based on injury caused by elimination of parts of the Exclusion, *e.g.*, *API III*, 862 F.3d at 66, the Transfer-Based Exclusion deprives petitioners' members of Subtitle C protections that Congress deemed necessary to address health or environmental risks. Congress acknowledged the potential threat to human health and the environment associated with hazardous wastes when it required EPA to promulgate regulations governing their storage, treatment, and disposal. 42 U.S.C. § 6903(5)(B). By definition, the existing Subtitle C regulations are those EPA has determined to be "necessary to protect human health and the environment." *Id.* §§ 6922(a), 6923(a), 6924(a). In their declarations, petitioners' members describe how their reasonable fear of those same health or environmental risks impairs their ability to feel safe and to enjoy the outdoors. Several declarants state that they spend less time outdoors exercising, gardening, walking their dogs, or fishing, or do not enjoy these outdoor activities as much, due to their worries about health and environmental harms. Cheung Decl. ¶¶ 10–11; Feldman Decl. ¶¶ 6–9; Ford Decl. ¶¶ 6–8; Kilgour Decl. ¶ 10.

This court has concluded in similar circumstances that environmental petitioners have standing to challenge regulatory actions under RCRA. In *Sierra Club v. EPA*, 755 F.3d 968 (D.C. Cir. 2014), the court held that similar declarations explaining "individuals' particularized fears of

serious health and environmental consequences" and "their individual behavioral changes" resulting from the regulatory change established injury in fact for Article III standing. *Id.* at 974–75. Similarly, in *NRDC v. EPA*, 755 F.3d 1010 (D.C. Cir. 2014), the court deemed sufficient "declarations of long-time members who spend time near facilities which, as a result of the [challenged] Exclusion, now burn comparable fuels" and who "spend less time outdoors" due to their "concern[] about the emissions' effects on their health." *Id.* at 1016–17. If a challenged regulation causes individuals to reasonably fear health or environmental harms and thus prevents them from using or enjoying the aesthetic or recreational value of their area, their injury suffices for Article III standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 182–83 (2000); *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 672–73 (D.C. Cir. 2013).

The seven years the Transfer-Based Exclusion was in effect have not, as EPA suggests, rendered petitioners' concerns speculative. During that time, only a small subset of the industry facilities eligible for the Exclusion took advantage of it. *See API III*, 862 F.3d at 66; *compare* 2008 Rule, 73 Fed. Reg. at 64,668 (5,600 facilities eligible for 2008 Exclusion), *with* 2015 Rule, 80 Fed. Reg. at 1,708 (65 facilities utilizing Exclusion in April 2014). Industry intervenors acknowledge that most states refrained from adopting the Transfer-Based Exclusion "due to uncertainty over the long-term status of the exclusion." Intervenor-Respondents' Br. 12–13. But facilities now qualifying for the Exclusion are likely to "take advantage of the Exclusion for which they lobbied" EPA, *Sierra Club*, 755 F.3d at 975, as indicated by industry intervenors' claim of standing on this basis. *See* Intervenor-Respondents' Br. 3.

**2. Waiver.** Generally, "a party must initially present its comments to the agency during the rulemaking in order for the

court to consider the issue." *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991). Its objections must be stated "with sufficient specificity reasonably to alert the agency." *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (quoting *Tex Tin Corp.*, 935 F.2d at 1323). There is no waiver here.

The waiver rule exists to "ensure an agency has had 'an opportunity to consider the matter, make its ruling, and state the reasons for its action.'" *Okla. Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014) (quoting *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)). EPA had an opportunity to and did address petitioners' contentions during the notice-and-comment period for the 2008 Rule. Although EPA attempts to recast petitioners' current contentions as new, Sierra Club raised the same concerns in 2007 as petitioners here about the relevance of generators' payment to recyclers and the insufficiency of the Transfer Conditions. EPA's Response to Comments shows it was aware of these objections to the proposed rule. *See NRDC*, 755 F.3d at 1022–23.

Regarding the payment issue, EPA quoted Sierra Club's concerns, *see Revisions to the Definition of Solid Waste*, Response to Comments Document, 88 (Oct. 1, 2008), and explained that although it would not "mak[e] its finding on discard solely based on the 'value' of the recycled material[,] '[v]alue' is one aspect of the Agency's findings and[] contributes to the ultimate determination that materials complying with the conditions and restrictions of this regulation are not discarded," *id.* at 91.

Regarding the sufficiency of the Transfer Conditions, EPA noted commenters' views that "before EPA can lawfully claim that excluded materials are not discarded, the Agency would

need to strengthen the conditions to protect human health and the environment" and that "the minimal conditions in the proposal are not sufficient to protect against discard." *Id.* at 86. EPA disagreed that the Transfer Conditions were inadequate, stating that "[e]ach of the restrictions and/or conditions is specifically linked to defining when the hazardous secondary materials are not discarded." *Id.* at 91–95.

**3. Timeliness.** RCRA provides that parties may seek review in this court of EPA regulations "within ninety days from the date of such promulgation . . . or after such date if such petition for review is based solely on grounds *arising after* such ninetieth day." 42 U.S.C. § 6976(a)(1) (emphasis added). The circumstances leading to the instant petition are a classic example of the "after-arising grounds" exception. Petitioners timely raised their challenges to the Transfer-Based Exclusions of 2008 and 2018.

Petitioners filed the instant challenge to the 2008 Rule and the Transfer-Based Exclusion reissued in 2018 on June 12, 2018 (within 90 days of the 2018 issuance but not within 90 days of the 2008 Rule). The after-arising grounds exception to the 90-day time limit "encompasses the occurrence of an event that ripens a claim." *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 129–30 (D.C. Cir. 2012). In January 2009, Sierra Club petitioned for review of the 2008 Rule and sought reconsideration by EPA. Within a month EPA indicated it would consider withdrawing the rule and proposing a new one to address Sierra Club's concerns. The court granted the joint motion of Sierra Club and EPA to hold the petition in abeyance. EPA promulgated a new rule in 2015, at which point Sierra Club dismissed its petition for review without prejudice to challenges to future rules, in accordance with its 2010 settlement agreement with EPA. *See API III*, 862 F.3d at 56.

Sierra Club's challenge to the 2008 Rule would have been unripe in view of EPA's expressed intention to withdraw the Transfer-Based Exclusion. The court so held with regard to industry groups' petition challenging the 2008 Rule. *See Am. Petroleum Inst. v. EPA* ("*API II*"), 683 F.3d 382, 384, 387–88 (D.C. Cir. 2012). The court's decisions in 2017 and 2018 and EPA's reissuance in 2018 of a Transfer-Based Exclusion had the effect of re-ripening Sierra Club's challenge. *See Coal. for Responsible Regulation*, 684 F.3d at 131. The court's "'finding of unripeness gives petitioners the needed assurance' that they will not be foreclosed from judicial review when the appropriate time comes." *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 473 (D.C. Cir. 1998) (quoting *Public Citizen v. Nuclear Regulatory Comm'n*, 940 F.2d 679, 683 (D.C. Cir. 1991)).

The court's decision in *Alaska v. Department of Agriculture*, 772 F.3d 899 (D.C. Cir. 2014), is to similar effect. A 2001 Forest Service rule prohibited road construction on national forest lands. The Forest Service repealed the rule in 2005, but a district court reinstated it in 2006. *Id.* at 900. This court rejected the Forest Service's timeliness objection, holding that when the rule was reinstated in 2006 after its prior repeal, a new right of action accrued under the reopening doctrine "even though the regulation challenged is no different." *Id.* (citing *Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988)). The case for timeliness here is stronger than in *Alaska* because the 2018 Transfer-Based Exclusion differs from the 2008 version of the Transfer-Based Exclusion. For example, the 2018 version includes emergency preparedness and containment requirements first added in 2015 and also now applies to spent refinery catalysts. *See API III*, 862 F.3d at 66–67, 75; *API IV*, 883 F.3d at 923.

**4. Claim Preclusion.** Under the doctrine of claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). "A subsequent lawsuit is barred by claim preclusion 'if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction.'" *NRDC v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)). Because the instant petition involves a different Transfer-Based Exclusion, claim preclusion does not bar petitioners' contentions.

Petitioners do not raise the same claims as they raised or could have raised in 2015 because the Verified Recycler Exclusion and the 2018 Transfer-Based Exclusion are different. *See API III*, 862 F.3d at 64–65, 75. A judgment "bars any further claim based on the same 'nucleus of facts,'" but where an earlier action "could not have asserted claims based on facts that were not yet in existence," dismissal based on claim preclusion is not allowed. *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984); *see also Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002). Claim preclusion "does not preclude a suit arising from a completely different event, no matter how similar the defendant's []conduct." *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 311 (7th Cir. 2010) (citing *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955)). As petitioners note, the Transfer-Based Exclusion did not exist in its current form when they challenged the 2015 Rule in *API III & IV*; therefore, the causes of action here and there are not the same.

**5. Issue Preclusion.** Under the doctrine of issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen*, 449 U.S. at 94. A prior holding has preclusive effect if three requirements are met: (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case;" (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case;" and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). For an issue to be actually and necessarily decided by a prior court, the determination must be essential to the court's judgment. *Id.* That is not the case here.

Although petitioners raised the same issues in *API III*, the court did not actually and necessarily decide them. In *API III*, the court identified the issues before it:

> Industry Petitioners argue that both the legitimacy test and the Verified Recycler Exclusion exceed EPA's RCRA authority. Industry Petitioners also challenge EPA's treatment of two specific materials: spent catalysts and off-specification commercial chemical products. Environmental Petitioners argue that the Verified Recycler Exclusion is too permissive and that EPA should have added containment and notification conditions to the 32 pre-2008 exclusions. We consider these challenges in turn.

862 F.3d at 56. The court also was careful to identify that it resolved only the issues raised by industry petitioners. The

court agreed that EPA had not sufficiently justified its decision to tighten the conditions to require administrative approval through a permit or variance, *id.* at 65, and therefore vacated the Verified Recycler Exclusion, *id.* at 71. As a result, the court stated it "need not address Environmental Petitioners' argument that the exclusion is too lenient." *Id.* at 72.

Nothing in the opinions in *API III* or *API IV* indicates the court rejected petitioners' contention that generators discard such materials by paying to get rid of them. This makes sense because the court had no need to consider petitioners' challenges once it decided to vacate the Exclusion based on industry groups' challenge. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 872 (D.C. Cir. 2001).

**6. *Stare Decisis.*** *Stare decisis* means that "the same issue presented in a later case in the same court should lead to the same result." *In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) (emphasis omitted) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996)). "*Stare decisis* compels adherence" only if the prior court reached a "factually indistinguishable decision." *Brewster v. Comm'r*, 607 F.2d 1369, 1373 (D.C. Cir. 1979). No court has expressly decided whether hazardous materials that a generator pays a reclaimer to accept are necessarily "discarded" under RCRA. Petitioners' challenges are not barred by *stare decisis*.

In *API III*, 862 F.3d 50, the court discussed the confluence of transfer and low-value materials, but it did so only in the context of the industry groups' arbitrary-and-capricious challenge to the 2015 Verified Recycler Exclusion. *See id.* at 67–71. The court held that, in the absence of supporting data, EPA's theory was insufficient to justify the administrative approval requirements. The court did not address petitioners' contention that payment from a generator to a recycler

necessarily makes material "discarded" as a matter of statutory interpretation. *See generally id.* No party has identified an opinion that has decided that issue. The court in *API III* also did not address petitioners' contention that the Transfer Conditions are insufficient to protect human health and the environment because they are less stringent than Subtitle C requirements. *See generally id.*

**II.**

On the merits, petitioners seek vacatur of the Transfer-Based Exclusion, 40 C.F.R. § 261.4(a)(24)–(25), as contrary to RCRA. The court may set aside the Transfer-Based Exclusion if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). *See* 42 U.S.C. §§ 6903(27), 6922–6924. In reviewing an agency's interpretation of a statute it administers, the court applies the familiar two-step test of *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984): If Congress has "directly spoken to the precise question at issue," then the court must "give effect to the unambiguously expressed intent of Congress"; otherwise the court defers to the agency's reasonable interpretation of a statute it administers, *id.* at 842–43.

In RCRA, Congress required EPA to regulate both hazardous and non-hazardous "solid waste," with more stringent requirements applying to hazardous waste. Subtitle C of RCRA establishes a "cradle-to-grave" regulatory structure for handling hazardous solid waste. 42 U.S.C. §§ 6921–6939g; *Shell Oil Co. v. EPA*, 950 F.2d 741, 745 (D.C. Cir. 1991). These provisions apply only to materials first qualifying as "solid waste," and hence the statutory definition of "solid waste" underlies the EPA regulations at issue here. RCRA defines

"solid waste" as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility *and other discarded material*." 42 U.S.C. § 6903(27) (emphasis added). If a material is "discarded," it is a solid waste and "falls within the jurisdiction of [] EPA." *Shell Oil*, 950 F.2d at 754. RCRA does not define "discarded material" as used in the statutory definition of "solid waste," but by regulation EPA has clarified that the term includes recycled material in certain circumstances, 40 C.F.R. § 261.2(a)(2), (c). In 2008, EPA interpreted the term "discarded material" not to include hazardous secondary materials that are transferred to a reclaimer if they meet Transfer Conditions to ensure the materials are actually and properly recycled. *See* 2008 Rule, 73 Fed. Reg. at 64,675.

Petitioners challenge the Transfer-Based Exclusion in the 2008 Rule and as issued in 2018 following this court's remand, 40 C.F.R. §§ 261.2(a)(1), 261.4(a)(24), on the principal ground that material a generator pays to get rid of is "discarded" under the ordinary meaning of that term and thus constitutes "solid waste" that EPA lacks authority to exclude from Subtitle C requirements. *See* Pet'rs' Br. 22. In their view, any ambiguity about the meaning of "discard" does not extend to materials generators pay to get rid of, which "fall so easily into the ordinary meaning of discarded." *Id.* Petitioners consider EPA's focus on the Transfer Conditions to prevent secondary spills and leaks during transport to be irrelevant to the question of "discard," noting EPA's acknowledgement that generators "often ship these materials . . . to avoid the costs of disposing of the material" and "typically pay the reclamation facility to accept [them]." *Id.* at 30 (alterations in original) (quoting 2015 Rule, 80 Fed. Reg. at 1707).

Petitioners do not contend that either transfer or reclamation necessarily constitutes "discard." They also do not

contend that hazardous secondary materials must always be treated as hazardous waste under RCRA. Instead, they contend that a generator's payment to a reclaimer to accept such material necessarily indicates the material has negative value to the generator and the transfer is a means of getting rid of, or "discarding," the material. *See id.* at 31–32.

Congress has not directly answered the question whether "discarded material" under RCRA includes hazardous secondary material that a generator has paid a reclaimer to accept. The parties do not point to anything in the statutory text, structure, or legislative history of RCRA that clearly answers whether "discarded" includes or excludes materials that a generator pays to transfer to a reclamation facility and that meet the Transfer Conditions. But this court's precedent effectively forecloses petitioners' plain-meaning contention that payment is determinative of "discard."

In *American Mining Congress v. EPA* ("*AMC I*"), 824 F.2d 1177 (D.C. Cir. 1987), the court agreed with industry groups challenging EPA's authority under RCRA to regulate materials destined for immediate recycling or reuse within an ongoing production process. The court concluded these materials were not "discarded" because they "ha[d] not yet become part of the waste disposal problem." *Id.* at 1186. The court recognized that the "ordinary, plain-English meaning of the word 'discarded' is 'disposed of,' 'thrown away,' or 'abandoned.'" *Id.* at 1184. Notably, the court declined to "attribute decisive significance to the ordinary meaning of [the] statutory language" because the court viewed EPA's expansive plain-meaning interpretation not to comport with Congress's objectives. *Id.* In particular, the court was of the opinion that Congress's likely intent was that the term "discarded" be read consistent with "everyday parlance" rather than "in its broadest sense." *Id.* at 1187. That is, in RCRA Congress sought to

address the "ever-increasing problem of solid waste disposal by encouraging the search for and use of alternatives to existing methods of disposal (including recycling)." *Id.* at 1185–86 (emphasis omitted). Critically for the instant case, the court held that EPA lacked authority under Subtitle C to regulate materials "destined for beneficial reuse or recycling in a continuous process by the generating industry itself." *Id.*

In response to industry and environmental challenges, the court has since clarified how *AMC I* is properly understood, explaining that "discarded" is, in some circumstances, ambiguous with respect to EPA's regulatory authority. *See Am. Petroleum Inst. v. EPA* ("*API I*"), 906 F.2d 729, 740 (D.C. Cir. 1990); *Am. Mining Cong. v. EPA* ("*AMC II*"), 907 F.2d 1179, 1186 (D.C. Cir. 1990); *cf. Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1056 (D.C. Cir. 2000). In *API I*, 906 F.2d 729, the court acknowledged the ambiguity about EPA's authority to regulate K061 slag, which is a "sludge" and therefore a "solid waste" when it leaves the electric furnace that generated it. *Id.* at 740. There, EPA had promulgated a rule declining to regulate K061 slag once it reached a metal reclamation facility because it was no longer "discarded." *Id.* The court held EPA had overread *AMC I* and vacated the rule. An "equally plausible reading" of RCRA's definition of "solid waste," the court stated, "is that K061 remains 'discarded' *throughout* the 'waste treatment' process dictated by the agency." *Id.* Therefore EPA's contrary interpretation would be inconsistent with "RCRA's acknowledged objective to 'establish[] a cradle-to-grave regulatory structure' for the safe handling of hazardous wastes." *Id.* at 741 (alteration in original) (quoting *United Techs. Corp. v. EPA*, 821 F.2d 714, 716 (D.C. Cir. 1987)).

In *Shell Oil,* 950 F.2d 741, the court confirmed that *AMC I* does not affect "EPA's ability to regulate hazardous materials

after they have been discarded." *Id.* at 756. It upheld EPA's interpretation that "[i]f a hazardous material has been discarded, it becomes subject to Subtitle C regulation even if it is sent to a resource recovery facility." *Id.*

But in *Association of Battery Recyclers*, 208 F.3d 1047, the court rejected EPA's interpretation that materials are "discarded" if they are not immediately reused where they are destined for reclamation within an ongoing production process. *Id.* at 1052. The court held EPA had "misread[] passages [in *AMC I*] to mean that it may treat secondary materials as 'discarded' whenever they leave the production process and are stored for any length of time." *Id.* The court explained: "Congress clearly and unambiguously expressed its intent that 'solid waste' . . . be limited to materials that are 'discarded' by virtue of being disposed of, abandoned, or thrown away," *id.* at 1051 (quoting *AMC I*, 824 F.2d at 1193), and "material stored for recycling is plainly not in that category," *id.* at 1053. The court reiterated *AMC I*'s conclusion that "secondary materials which are treated prior to recycling cannot be considered discarded if they are 'reused within an ongoing industrial process.'" *Id.* at 1054 (quoting *AMC I*, 824 F.2d at 1182)).

Similarly, in *Safe Food & Fertilizer v. EPA*, 350 F.3d 1263 (D.C. Cir. 2003), the court rejected environmental petitioners' contention, relying on *AMC I*, that transfer to another firm or industry for recycling necessarily means materials are "discarded." *Id.* at 1268. As the court explained, "we have never said that RCRA compels the conclusion that material destined for recycling in another industry is necessarily 'discarded.'" *Id.* The court pointed out that because "firms have ample reasons to avoid complete vertical integration, firm-to-firm transfers are hardly good indicia of a 'discard' as the term is ordinarily understood." *Id.* (citation omitted). The court accepted EPA's exclusion of certain materials from

Subtitle C regulation if they met certain conditions under which "market participants treat the exempted materials more like valuable products than like negatively-valued wastes, managing them in ways inconsistent with discard." *Id.* at 1269.

Finally, in *API III*, 862 F.3d 50, the court rejected EPA's theory that additional stringency in the 2015 Verified Recycler Exclusion requiring a permit or variance was justified because the confluence of transfer and low-value materials creates perverse incentives for facilities to over-accumulate hazardous secondary materials without recycling them, resulting in "discard." *Id.* at 68–69. Because EPA "fail[ed] to provide sufficient linkage between theory, reality, and the result reached," as required under *State Farm*, *id.* at 68, EPA lacked a sufficient basis to issue a blanket rule finding "discard" and applying Subtitle C when the recycled material is transferred and of low value. *Id.* at 65.

The court's precedent thus leaves no room to conclude that Congress directly resolved that "discarded material" must include hazardous secondary materials that a generator has paid a reclaimer to accept. Under the second part of the *Chevron* test, 467 U.S. at 843, the question is whether EPA's interpretation is "based on a permissible construction of the statute." It need not be "the *only* permissible construction, nor 'the reading the court would have reached if the question initially had arisen in a judicial proceeding.'" *Northpoint Techn., Ltd. v. FCC*, 414 F.3d 61, 69 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 843 n.11). Deference is due to the agency's permissible interpretation "if the agency has offered a reasoned explanation for why it chose that interpretation." *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).

Petitioners contend EPA is not entitled to *Chevron* deference because it did not give a reasoned explanation for its interpretation of "discarded." We disagree.

EPA stated in the Preamble to the 2008 Rule that its interpretation of "discarded" "reflects the fundamental logic of the RCRA statute" and accords with this court's "plain language definition of discard." 2008 Rule, 73 Fed. Reg. at 64,675–76. Although Congress's "overriding concern" in enacting RCRA was to ensure proper waste management, H.R. REP. NO. 94-1491, at 3 (1976), it also aimed to encourage proper recycling and recovery of hazardous materials as an alternative to disposal, *see* 42 U.S.C. § 6902(a)(6). The House Committee's Report concludes that properly conducted reuse, recycling, and reclamation are inconsistent with "discard," stating that "[m]uch industrial and agricultural waste is reclaimed or put to new use and is therefore not a part of the discarded materials disposal problem the committee addresses." H.R. REP. NO. 94-1491, at 2. In promulgating the 2008 Rule, EPA acknowledged that Congress intended certain hazardous materials destined for recycling to be regulated. Excluding all hazardous secondary materials destined for recycling, EPA stated, "seems inconsistent with the mandate to track hazardous wastes and control them from 'cradle to grave.'" 2008 Rule, 73 Fed. Reg. at 64,671. This court has embraced the view that if materials never become part of the waste disposal problem, then they are not "discarded" and need not be regulated under Subtitle C. *E.g.*, *AMC I*, 824 F.2d at 1179, 1186.

In these circumstances, EPA has reasonably equated legitimate recycling with lack of "discard." If the Transfer Conditions and Legitimacy Factors adequately ensure legitimate recycling, as EPA has determined, *see* 2018 Rule, 83 Fed. Reg. at 24,665; 2008 Rule, 73 Fed. Reg. at 64,677–79,

then materials conforming to them are not "discarded." The fact that generators pay reclaimers to accept certain materials may indicate the material has negative value and the generator is "getting rid of" it, as petitioners contend. On the other hand, EPA explained that payment may indicate only that a generator seeks alternatives to costly Subtitle C requirements and is willing to pay anything less than the compliance costs in order to recycle materials. *See* 2008 Rule, 73 Fed. Reg. at 64,675, 64,677, 64,707. EPA relied on its market forces study to conclude that reclaimers may charge such a fee not because they must, but rather because they *can* as a result of a lack of competition in certain recycling markets. *Id.* at 64,707. EPA also explained that generators may have to pay reclaimers to offset the reclaimers' upfront capital costs to develop and implement the necessary recycling infrastructure and market. *Id.* Moreover, EPA's Transfer-Based Exclusion does not ignore the potential relevance of payment as an indicator of "discard." Instead these economic issues are part of its Legitimacy Factors analysis, *see id.* at 64,706–07, which require that hazardous secondary material "provide[] a useful contribution to the recycling process," that the recycling process "produce a valuable product or intermediate," and that the generator and recycler manage the material "as a valuable commodity when it is under their control." 40 C.F.R. § 260.43.

Consequently, EPA's decision in adopting the Transfer-Based Exclusion not to make payment from a generator to a reclaimer dispositive in assessing whether material is "discarded" is a permissible interpretation of "discard."

**III.**

Agency action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* Agency action is also arbitrary and capricious if it "offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

Petitioners contend the Transfer-Based Exclusion is arbitrary and capricious because EPA failed to provide a reasoned basis for treating the same hazardous materials differently and to account for its prior findings that the Transfer Conditions are inadequate. Given EPA's reasoned explanation of the Transfer-Based Exclusion, we conclude these contentions are unpersuasive.

## A.

EPA has sufficiently explained its different treatment of similar materials. Hazardous secondary materials destined for legitimate recycling are dissimilar in one key respect. Application of RCRA's Subtitle C cradle-to-grave regulatory scheme depends on whether materials first qualify as "solid waste" because they are "discarded." *See* 42 U.S.C. § 6903(27). Materials that are not "discarded" are not subject to Subtitle C. *Shell Oil*, 950 F.2d at 754. Subtitle C regulations aim to ensure that hazardous waste, once "discarded," is transported, treated, and stored safely. *See* 42 U.S.C. §§ 6921–6939g. These regulations focus on waste that has made its way to a landfill, an incinerator, or a similar waste storage or treatment facility, in order to ensure that such waste does not contaminate local water supplies, generate toxic gases and

cause air pollution, combust, etc. *See id.* § 6901(b). The Transfer Conditions, by contrast, seek to ensure that hazardous secondary materials do not end up in a landfill, incinerator, or similar facility but instead remain in a continuous stream or flow of production within industry processes. *See AMC I*, 824 F.2d at 1190. They address potential risks by requiring the third-party reclaimers that accept such materials to handle them properly and safely and not to discard them. *See* 2008 Rule, 73 Fed. Reg. at 64,673.

EPA's adoption of the Transfer-Based Exclusion and its conditions rests on the premise that materials sent to a reclamation facility to be stripped and reused or recycled are not part of the waste disposal problem targeted by Subtitle C regulations. Although "[h]azardous secondary materials stored or transported prior to recycling have the potential to present the same types of threats to human health and the environment as hazardous wastes stored or transported prior to disposal," *id.* at 64,671, EPA explained that "recycling of these materials often closely resembles industrial manufacturing rather than waste management," *id.* at 64,670. EPA also acknowledged that when hazardous secondary materials have negative rather than positive value (e.g., raw materials), reclaimers may respond differently than traditional manufacturers "to economic forces and incentives," causing them to "accumulat[e] more inputs." *Id.* at 64,678.

Responding to that concern, EPA adopted Transfer Conditions and Legitimacy Factors to ensure that, under the Transfer-Based Exclusion, materials may be sent only to reclaimers that have economic incentives to responsibly manage and recycle them. *See id*. at 64,671; 40 C.F.R. § 261.4(a)(24)(iv). Specifically, EPA addressed possible points of "discard," whether unintended or surreptitious, during the transfer process. Although materials falling under the

Transfer-Based Exclusion need not comply with RCRA's prescriptive containment requirements, *see* 40 C.F.R. § 262.17, the Transfer Conditions prohibit intermediate facilities from holding any material in storage for longer than 10 days, *id.* § 261.4(a)(24)(ii), and therefore prohibit reclaimers from abandoning materials in warehouses or other facilities, *see* 2008 Rule, 73 Fed. Reg. at 64,673. Generators, intermediate facilities, and reclaimers are required to maintain records of shipments and receipts of hazardous secondary materials, 40 C.F.R. § 261.4(a)(24)(v)(D)–(E), (vi)(A)–(C), in order to enable EPA and the states to determine that materials "arrived at the intended facility and were not discarded in transit," 2008 Rule, 73 Fed. Reg. at 64,679. The Transfer Conditions also require a reclamation facility to reclaim at least 75% of hazardous secondary materials it obtains over a calendar year, *see* 40 C.F.R. § 261.4(a)(24)(i); *id.* § 261.1(c)(8), as a means of ensuring reclaimers fulfill their role of facilitating resource conservation and preventing hazardous materials from entering landfills or other facilities, *see* 2008 Rule, 73 Fed. Reg. at 64,685. The reclaimer must manage the material in a manner at least as protective as it handles analogous raw material. 40 C.F.R. § 261.4(a)(24)(vi)(D). Any residual materials generated by reclamation operations must be regulated under RCRA, including under Subtitle C if they are "discarded," *id.* § 261.4(a)(24)(vi)(E), so reclamation does not become a means of "discard" of unwanted material without complying with Subtitle C regulations, *see* 2008 Rule, 73 Fed. Reg. at 64,691. Enforcement mechanisms can also include imposition of Subtitle C requirements upon noncompliance with these conditions. *See id.* at 64,690, 64,699–700.

The Transfer Conditions thereby advance RCRA's objectives by encouraging properly conducted recycling and promoting preservation of limited material resources and space for storing "solid waste." Absent a statutory requirement that

these conditions be identical to Subtitle C requirements, EPA's response was not arbitrary and capricious.

**B.**

EPA has also adequately addressed why it considers the Transfer-Based Exclusion's conditions sufficient when it had expressed concern they might not be implemented as expected. Pet'rs' Br. 44 (citing 2015 Rule, 80 Fed. Reg. at 1707–08).

Although EPA had previously questioned the adequacy of the Transfer Conditions, the circumstances of recycling by the time EPA issued the Transfer-Based Exclusion in 2008 were different than the recycling landscape dating back to the 1980s that EPA's environmental problems study had examined. *See* 2015 Rule, 80 Fed. Reg. at 1708–09. Industry pointed to evidence of improved recycling management and controls over time in response to the rigor of enforcement efforts and industry's interest in avoiding costly Subtitle C requirements by properly recycling or reusing materials. *See* 2008 Rule, 73 Fed. Reg. at 64,673.

Agreeing the environmental problems highlighted in the study "demonstrate[d] the need" for "restrictions and conditions for the exclusions," *id.* at 64,722–23, EPA proposed requirements for financial assurance, reasonable efforts, shipping documentation, hazardous secondary materials management, legitimate recycling, and speculative accumulation that became part of the Transfer Conditions. EPA's study of successful recycling had shown that "generators who could otherwise bear a large liability from poorly-managed recycling at other companies have addressed [these] issue[s] by carefully examining the recyclers to which they send their hazardous secondary materials, such as through audits to ensure that they are technically and financially capable of performing the recycling." 2015 Rule, 80 Fed. Reg.

at 1699. Based on best practices many industry facilities were already implementing with success in preventing discard and curbing environmental and health risks, 2008 Rule, 73 Fed. Reg. at 64,673–74, 64,683, EPA adopted restrictions and conditions that it determined were "sufficient to ensure safe recycling activities," *id.* at 64,722.

Accordingly, we deny the petition. Under this court's precedent EPA did not exceed its authority under RCRA in adopting the Transfer-Based Exclusion because hazardous secondary materials are not necessarily "discarded" each time they are transferred from a generator to a reclaimer along with payment. EPA has also adequately explained why such materials may be subject to the Transfer Conditions rather than full Subtitle C requirements.