T.C. Memo. 2020-80

UNITED STATES TAX COURT

EDWARD S. FLUME AND MARTHA S. FLUME, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 31162-14.                          Filed June 9, 2020.

<u>David Rodriguez</u>, for petitioners.

<u>Roberta L. Shumway</u> and <u>Sheila R. Pattison</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, <u>Judge</u>:  By statutory notice of deficiency dated October 1,

2014, respondent determined deficiencies in petitioners' Federal income tax and

[*2] accuracy-related penalties pursuant to section 6662(a)[1] for the 2006, 2007, and 2008 taxable years (years at issue) as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2006 | $9,384 | $1,877 |
| 2007 | 20,142 | 4,028 |
| 2008 | 31,938 | 6,388 |

After concessions,[2] the issues remaining for decision for the years at issue are whether petitioners[3] (1) had additional wage income, (2) had reportable subpart F income, and (3) are liable for accuracy-related penalties.

We resolve the first issue in respondent's favor for 2006 and 2007 and partly in petitioners' favor for 2008, the second issue in respondent's favor for

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[2]The notice of deficiency determined in pertinent part that petitioners were not entitled to claim net operating loss (NOL) carryforwards of $1,229,364, $1,229,364, and $1,224,600 for 2006, 2007, and 2008, respectively. Petitioners concede that they are not entitled to said NOL carryforwards. Additionally, respondent concedes that because of a computational error the additional wage income for 2006 determined in the notice of deficiency should be reduced by $8,000.

[3]Mrs. Flume did not appear at trial, but the Court's decision will be binding upon both spouses.

[*3] 2006 and 2007 and in petitioners' favor for 2008, and the third issue in respondent's favor.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. During the years at issue and when the petition was timely filed petitioners were U.S. citizens residing in Mexico.

I.      Petitioners' Business Activities in Mexico

Since at least 1990 petitioners have lived and worked in Mexico. Before moving to Mexico Mr. Flume was an urban planner and developer in the United States; Mrs. Flume is a licensed real estate broker in Texas and assisted with the marketing of their residential real properties in Mexico.

During the years at issue petitioners operated a real estate development and construction business in and around San Miguel de Allende, Mexico; they developed land, sold lots, and built luxury homes.

A.      Franchise Food Services de Mexico S.A. de C.V.

Franchise Food Services de Mexico S.A. de C.V. (FFM) is a Mexican sociedad anonima, which is a limited liability stock corporation that adopted the form of a variable capital company. FFM was incorporated in Guadalajara,

[*4] Jalisco, Mexico, in 1995 to operate two fast food franchises that Mr. Flume owned. Initially there were two 50% shareholders of FFM, Mr. Flume and Norwick Adams. Mr. Flume was FFM's president, and Mr. Adams was FFM's secretary and treasurer. The fast food franchises were sold in 1998, but FFM remained intact, having at least one U.S. bank account.

On February 8, 2002, Mr. Flume transferred 41% of his 50% ownership interest in FFM to Victor Mendez Tornell.[4] During the years at issue Mr. Tornell was a Mexican citizen. Mr. Tornell has never been an officer or a director of FFM and had no desire to act in either capacity.

During the years at issue FFM was an active corporation. On January 15, 2007, petitioners entered into a consulting and personal services contract with FFM, and FFM made payments to them for their services.

B.   Wilshire Holdings, Inc.

To manage their real estate development and construction activities, on February 23, 2000, petitioners incorporated Wilshire Holdings, Inc. (Wilshire), in the Bahamas, with each holding one bearer share of Wilshire capital stock.

---

[4]Mr. Tornell is the husband of Nicole Bisgaard Ryan, the architect petitioners hired for their real estate development and construction business in Mexico. On February 8, 2002, Mr. Adams transferred his 50% ownership interest in FFM to his new wife, Alba Valenzuela.

[*5] During Wilshire's February 23, 2000, organizational meeting Mr. Flume was named as Wilshire's director and secretary. The following year petitioners changed the domicile of Wilshire, reincorporating it in Belize. At a time not established by the record petitioners amended Wilshire's original Belizean articles of association. These amended articles of association were backdated to April 12, 2001, to reflect the date of original incorporation in Belize. As stated in these amended articles of association petitioners' bearer shares in Wilshire were eliminated and they and their daughter each held a 9% ownership interest, and Mr. Tornell held the remaining 73% ownership interest in Wilshire. During at least the years at issue Mr. Flume was the president and a director of Wilshire, and Mrs. Flume was the vice president and a director of Wilshire.

Petitioners opened bank or brokerage accounts in Wilshire's name with Laredo National Bank (now BBVA Compass Bank) in 2000 (BBVA Compass Bank account), United Bank of Switzerland (UBS) in 2005 (UBS account), and Fidelity Investments at a time not established by the record (Fidelity account). They had sole signature authority over each of these accounts. The BBVA Compass Bank account was opened in the United States using a U.S. identification number petitioners obtained for Wilshire. The UBS account was opened outside the United States, and in doing so petitioners provided UBS with (among other

[*6] documents) Wilshire's original memorandum and articles of association and a certificate of incumbency for Wilshire from the Corporate Services Division of the Belize Bank Limited in Belize City, Belize. The certificate of incumbency identified Mr. Flume as Wilshire's sole director and Wilshire's shareholders as two "[b]earers" holding one share each of its capital stock. UBS' due diligence documents identified petitioners as the beneficial owners of the UBS account, Mr. Flume as Wilshire's "only shareholder and owner", and the account's purpose as "[w]ealth [m]anagement of retirement funds; probably [a] loan for [a] flat in Paris." It is unknown how the Fidelity account was opened.

In addition to maintaining at least one personal bank account and several personal brokerage accounts and credit cards, petitioners maintained several business credit cards where Wilshire and Mr. Flume were listed as the primary cardholders and Mrs. Flume was an authorized user.

Wilshire did not compensate petitioners by check or direct deposit for the years at issue; instead, it would transfer funds from its BBVA Compass Bank, UBS, and Fidelity accounts to petitioners' personal accounts or directly pay some of their personal expenses. Payments made by Wilshire of petitioners' personal expenses during the years at issue include payments of their personal credit card charges, travel expenses, household furnishings, automatic teller machine

[*7] withdrawal service charges, tuition, gifts to relatives, and rent for an apartment in San Francisco, California.  In addition Wilshire would transfer funds from its BBVA Compass Bank account to FFM "in lieu of salary" to petitioners.

C.    SMA Property Development

On January 15, 2007, FFM and Wilshire entered into a five-year joint venture agreement to acquire, develop, and sell residential real property in Mexico.  This joint venture of FFM and Wilshire operated under the name SMA Property Development (SMA).  Petitioners managed the affairs and funds of SMA, and more specifically, Mr. Flume served as SMA's managing partner.  On January 15, 2007, petitioners were also given powers of attorney to act jointly and independently as the attorneys-in-fact of SMA.  As SMA's attorneys-in-fact they were authorized to retain any assets owned by SMA and reinvest those assets, co-own assets and commingle their funds with the funds of SMA, and personally gain from any transaction they completed on SMA's behalf.

II.    Petitioners' Joint Federal Income Tax Returns

Petitioners' joint Federal income tax returns for the years at issue were prepared by Adriana Bautista Luna, a tax return preparer at Leonard Pendleton Purcell, Inc., a tax preparation firm in Mexico that used a post office box in Houston, Texas, as its mailing address on these returns.  The record does not

[*8] establish Ms. Luna's educational background and professional qualifications, including whether she was a U.S. certified public accountant (C.P.A.), and we decline to find facts in this regard. In a prior Tax Court case involving an Internal Revenue Service (IRS) proposed levy with respect to Mr. Flume's unpaid liabilities for civil penalties under sections 6038 and 6679 for the 2001-09 taxable years for failure to file Form 5471, Information Return of U.S. Persons With Respect to Certain Foreign Corporations, Mr. Flume acknowledged that he did not know whether Ms. Luna had the necessary expertise to provide petitioners with U.S. tax advice and to prepare their joint returns for the years at issue.[5] Additionally, Mr. Flume acknowledged that Ms. Luna, in preparing these returns, did not know that petitioners held ownership interests in any foreign corporation other than FFM and that they did not advise her that they had sole signature authority over foreign bank accounts, other than those held in Mexico, until sometime in 2008 (or 2009).

Petitioners' 2006 return was filed on August 31, 2007. It reported adjusted gross income of –$1,227,563, consisting of "[w]ages, salaries, tips, etc." of $156,000, taxable interest of $556, ordinary dividends of $4,245, a capital loss of

---

[5]See Flume v. Commissioner (Flume I), T.C. Memo. 2017-21. The trial transcript from Flume I is a stipulated exhibit in this case.

[*9] $3,000, and "[o]ther income" of -$1,385,364. The reported "[w]ages, salaries, tips, etc." consisted of wages of $78,000 earned by each petitioner solely from FFM. The reported "[o]ther income" consisted of a foreign earned income exclusion totaling $156,000 (i.e., the reported total wages from FFM) as reflected on Forms 2555, Foreign Earned Income, attached to the 2006 return, and an NOL carryover totaling $1,229,364 (a $614,682 NOL carryover with respect to each petitioner) as reflected on a Line 21, Other Income Statement, also attached to the 2006 return.

Petitioners' 2007 return was filed on October 6, 2008. It reported adjusted gross income of -$1,216,900, consisting of "[w]ages, salaries, tips, etc." of $162,749, taxable interest of $429, ordinary dividends of $14,772, a capital loss of $3,000, income from "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc." of $102, and "[o]ther income" of -$1,391,952. The reported "[w]ages, salaries, tips, etc." consisted of wages of $80,376 and $82,373 earned by Mr. Flume and Mrs. Flume, respectively, solely from FFM. The reported "[o]ther income" consisted of a foreign earned income exclusion totaling $162,749 (i.e., the reported total wages from FFM) as reflected on Forms 2555 attached to the 2007 return, an NOL carryover totaling $1,229,364 (a $614,682 NOL carryover with respect to each petitioner) as reflected on a Line 21, Other Income Statement,

[*10] also attached to the 2007 return, and "SUBSTITUTE PAYMENTS" of $161, also as reflected on the Line 21, Other Income Statement.

Petitioners' 2008 return was filed on July 30, 2009. It reported adjusted gross income of –$1,218,592, consisting of "[w]ages, salaries, tips, etc." of $164,000, taxable interest of $1,348, ordinary dividends of $6,865, a capital loss of $3,000, income from "[r]ental real estate, royalties, partnerships, S corporations, trusts, etc." of $795, and "[o]ther income" of –$1,388,600. The reported "[w]ages, salaries, tips, etc." consisted of wages of $85,000 and $79,000 earned by Mr. Flume and Mrs. Flume, respectively, solely from FFM. The reported "[o]ther income" consisted of a foreign earned income exclusion totaling $164,000 (i.e., the reported total wages from FFM) as reflected on Forms 2555 attached to the 2008 return, and an NOL carryover totaling $1,224,600 (a $612,300 NOL carryover with respect to each petitioner) as reflected on a Line 21, Other Income Statement, also attached to the 2008 return.[6]

III.    Audit and Determination

In 2011 the IRS selected petitioners' returns for the years at issue and 2010 for audit. The audit was conducted by IRS Revenue Agent Raphaelle Johnson

---

[6]Petitioners' 2008 return also reported a recovery rebate credit of $600, resulting in a refund claimed of that same amount.

**[*11]** (RA Johnson).  Petitioners engaged David Rodriguez, their counsel of record here, to represent them during the audit.  RA Johnson issued several information document requests to petitioners.  Through Mr. Rodriguez, petitioners provided some of the requested records in various responses; to wit, spanning the years at issue, they provided (1) their personal bank account records, (2) corporate documents of Wilshire and FFM, (3) Wilshire's general ledgers, profit and loss statements, income statements, and balance sheets, and (4) Wilshire's and FFM's bank account records.  Since petitioners did not provide her with all of the requested records, RA Johnson issued third-party record keeper summonses to several U.S. financial institutions, brokerage companies, and credit card companies, including BBVA Compass Bank and Fidelity, and as a result of those summonses she received additional records pertaining in pertinent part to Wilshire's accounts with those institutions and companies.  Also in RA Johnson's possession were UBS' records pertaining to Wilshire's UBS account that the IRS received in response to a request for treaty information.

Using these records RA Johnson identified disbursements or transfers to petitioners or for their benefit.  She determined that petitioners had additional wage income from Wilshire, or in the alternative, additional dividend income, of

[*12] $44,524, $47,535, and $107,768 for 2006, 2007, and 2008, respectively.[7]

Specifically, for 2006 RA Johnson determined that petitioners' additional wage income was attributable to withdrawals from Wilshire's BBVA Compass Bank and UBS accounts for petitioners' personal use, to their personal accounts, and for the payment of their personal expenses, including their personal credit card charges. For 2007 RA Johnson determined that petitioners' additional wage income was attributable to withdrawals from Wilshire's BBVA Compass Bank, UBS, and Fidelity accounts for petitioners' personal use, to petitioners' personal accounts, and for the payment of their personal expenses, including their personal credit card charges. For 2008 RA Johnson determined that petitioners' additional wage income was attributable to withdrawals from Wilshire's BBVA Compass Bank and UBS accounts for petitioners' personal use, to their personal accounts, and for the payment of their personal expenses, including their personal credit card charges.

RA Johnson also determined that Wilshire was a controlled foreign corporation (CFC) that was 100% owned by petitioners for the years at issue, that the investment income from Wilshire's UBS and Fidelity accounts was foreign personal holding company income (FPHCI) under subpart F of the Code, and that

---

[7]RA Johnson allocated 50% of each amount to each petitioner.

[*13] as a result petitioners were required to report their pro rata share (100%) of that FPHCI as subpart F income (and taxable as additional ordinary dividend income) in the following amounts: $15,813 for 2006, $35,150 for 2007, and $17,778 for 2008. In the alternative RA Johnson determined that petitioners were required to report as ordinary income: (1) interest income attributable to Wilshire's UBS and Fidelity accounts of $1,238, $1,884, and $2,172 for 2006, 2007, and 2008, respectively; (2) ordinary dividend income attributable to Wilshire's UBS and Fidelity accounts of $18,502, $47,563, and $23,835 for 2006, 2007, and 2008, respectively; and (3) capital gains attributable to Wilshire's UBS and Fidelity accounts of zero, $16,359, and zero for 2006, 2007, and 2008, respectively.

Finally, RA Johnson determined that accuracy-related penalties for negligence, or in the alternative, for substantial understatements of income tax were warranted.

The notice of deficiency sent to petitioners on October 1, 2014, reflects those determinations. Petitioners were first notified, however, of the proposed changes to their Federal income tax for the years at issue, including the imposition of accuracy-related penalties, via a so-called 30-day letter, dated May 1, 2014, that the IRS sent to them (copies of the letter were actually addressed and sent to each

**[\*14]** petitioner as well as to Mr. Rodriguez).[8]  This 30-day letter contained in

pertinent part the prefatory heading "What to Do if You Do Not Agree with the

Proposed Changes", beneath which it explained that petitioners could request a

meeting or telephone conference with RA Johnson's supervisor, and if after that

meeting or telephone conference they still did not agree with the proposed

changes, they could request a conference with the IRS Office of Appeals

(Appeals) by submitting a formal protest.  The letter further advised that if

petitioners failed to reach an agreement with Appeals or if they did not respond to

the letter, a notice of deficiency would be issued to them.

Enclosed with the 30-day letter was (among other documents) an

examination report[9] consisting of a Form 4549-A, Income Tax Examination

Changes, a Form 886-A, Explanation of Items, and various worksheets detailing

the calculations of the proposed deficiencies and penalties.

---

[8]As explained infra pp. 30-33, we are reopening the record to admit the 30-day letter, together with certain enclosures with the letter (as discussed infra pp. 14-15), and a declaration of IRS Supervisory Internal Revenue Agent Robert G. Davis insofar as it authenticates the 30-day letter and these enclosures.

[9]The examination report is commonly called a "revenue agent's report" or "RAR".  Laidlaw's Harley Davidson Sales, Inc. v. Commissioner, 154 T.C. __, __ (slip op. at 7) (Jan. 16, 2020) (citing Branerton Corp. v. Commissioner, 64 T.C. 191, 194-195 (1975)).

**[*15]** The Form 4549-A was signed by RA Johnson (on May 1, 2014, the same date as the 30-day letter), and the 30-day letter was signed by Mr. Davis, who was RA Johnson's supervisor at the time.

The record includes a completed Civil Penalty Approval Form (dated twice--September 25, 2013, and May 2, 2014) that lists the years at issue and bears the signature of Acting IRS Supervisory Internal Revenue Agent Cassandra Moore, RA Johnson's supervisor on August 4, 2014 (the date she signed the form), approving section 6662(a) and (b)(1) penalties for negligence or disregard of rules or regulations "due to disallowance of unsubstantiated NOL * * * [carryforwards] and understated wages from a related corporation."[10] The "International Technical Service" of the Small Business/Self-Employed Division of the IRS issued the October 1, 2014, notice of deficiency to petitioners; the notice enclosed the same Form 886-A and various worksheets that were enclosed with the 30-day letter, as well as a Form 4549-A that was in all respects the same as the Form 4549-A also enclosed with the 30-day letter except that this Form

---

[10]As indicated infra pp. 30-33, we are also reopening the record to admit the Civil Penalty Approval Form (along with RA Johnson's "515 Workpapers" that the form references) and a declaration of Ms. Moore insofar as it authenticates the Civil Penalty Approval Form (and the referenced "515 Workpapers") for purposes of Fed. R. Evid. 902(11).

**[\*16]** 4549-A was dated September 25, 2014, did not reflect computed interest, and was signed by "L. Reynolds".

OPINION

I.    Burden of Proof

In general, the Commissioner's determinations set forth in a notice of deficiency are presumed correct and, except for the burden of production in any court proceeding with respect to a taxpayer's liability for any "penalty, addition to tax, or additional amount", see sec. 7491(c), the taxpayer bears the burden of proving otherwise, see Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

However, for this presumption to adhere in cases (such as this one) involving unreported income, the Commissioner must provide some reasonable foundation connecting the taxpayer with the income-producing activity.  See Blohm v. Commissioner, 994 F.2d 1542, 1549 (11th Cir. 1993), aff'g T.C. Memo. 1991-636; Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991), aff'g in part, rev'g in part T.C. Memo. 1990-68; Lemire v. Commissioner, Nos. 89-1180, 89-1181, 1990 U.S. App. LEXIS 6664, at \*8 (D.C. Cir. 1990).  Once the Commissioner has done this, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations of

**[*17]** unreported income are arbitrary or erroneous. <u>Helvering v. Taylor</u>, 293 U.S. 507, 515 (1935). Respondent's determinations set forth in the October 1, 2014, notice of deficiency to petitioners were based on substantive evidence linking petitioners with the income at issue.

The record in this case includes as stipulated exhibits (1) an analysis by RA Johnson of petitioners' and Wilshire's credit card transactions for the years at issue, (2) records for one of petitioners' personal bank accounts for 2006 and 2007, (3) Wilshire's bank and brokerage account records for the years at issue, (4) FFM's bank account records for 2007 and 2008, (5) certain corporate documents of Wilshire and FFM, and (6) Wilshire's general ledgers, profit and loss statements, income statements, and balance sheets for the years at issue. RA Johnson testified on behalf of respondent that she reviewed these (and other) records and she identified certain amounts from or attributable to Wilshire that should have been treated as unreported (wage and subpart F) income of petitioners. On the basis of this credible evidence, we are satisfied that respondent has proved that Wilshire is a likely source of the determined unreported income for the years at issue. Thus, as to this income, the burden of proof shifts to

[*18] petitioners to show that respondent's determinations in this regard were arbitrary or erroneous.[11]

II.    Wage Income

A taxpayer's gross income includes "all income from whatever source derived," including "[c]ompensation for services", e.g., wages and salaries. Sec. 61(a)(1); sec. 1.61-2(a)(1), Income Tax Regs. A taxpayer is required to maintain books or records sufficient to establish the amount of his or her gross income required to be shown by such person on any return. See sec. 6001; sec. 1.6001-1, Income Tax Regs. It is well settled that if the taxpayer's books or records do not clearly reflect income, then the Commissioner is authorized "to reconstruct income in accordance with a method which clearly reflects the full amount of income received." Petzoldt v. Commissioner, 92 T.C. 661, 687 (1989) (and cases cited threat). The Commissioner's reconstruction need only be reasonable under all the facts and circumstances. Id.

During the audit for the years at issue RA Johnson determined that petitioners had additional wage income from Wilshire totaling $44,524, $47,535,

_____

[11]Petitioners do not otherwise contend that the burden of proof should shift to respondent under sec. 7491(a), nor have they established that the requirements for shifting the burden of proof have been met. Accordingly, the burden of proof remains on petitioners.

[*19] and $107,768 for 2006, 2007, and 2008, respectively. She used the specific item method to make these determinations. The specific item method is a Court-approved "method of income reconstruction that consists of evidence of specific amounts of income received by a taxpayer and not reported on the taxpayer's return." Zang v. Commissioner, T.C. Memo. 2017-55, at *17 (citing Estate of Beck v. Commissioner, 56 T.C. 297, 353-354, 361 (1971)); see also Dyer v. Commissioner, T.C. Memo. 2012-224, at *17 (and cases cited threat) (noting that the Court has approved the specific item method for recomputing taxable income). Petitioners contend that respondent's wage adjustments are erroneous because they were transfers or disbursements from Wilshire's accounts to petitioners' personal accounts (1) to "pay off notes payable to Petitioner[s] for amounts * * * [they] previously recognized as [wage] income" and (2) for the reimbursement of "expenses [they] paid on Wilshire's behalf." According to petitioners, they reported all wages they received from Wilshire (and FFM) on their joint Federal income tax returns for the years at issue when the income was earned and therefore the additional amounts asserted by respondent as wage income "are being double counted."

With respect to petitioners' first reason, we agree that respondent double counted to the extent of $50,479 for 2008. As relevant here petitioners' 2007 and

[*20] 2008 returns reported total wages of $162,749 and $164,000, respectively; these same amounts are respectively reflected in Wilshire's general ledgers for 2007 and 2008 as "Total Expenses". More specifically, under "Total Expenses" in Wilshire's 2007 general ledger there is a December 31, 2007, entry categorized as a "General Journal" entry of $50,616 to Mr. Flume for a "Salaries Payable note". In other words on their 2007 return petitioners actually included the $50,616 "Salaries Payable note" amount in their reported total wages of $162,749. Separate and apart from said reporting, Wilshire's 2008 general ledger indicates that during 2008 Wilshire paid off the "Salaries Payable note" of $50,616; the ledger reflects 12 entries categorized as "Check" entries totaling $50,479 to FFM and one entry categorized as a "General Journal" entry of $179 to "reclassify" this amount as "Payable to Stockholders". However, as reflected in the examination report enclosed with the October 1, 2014, notice of deficiency to petitioners, RA Johnson's computation of additional 2008 wage income of $107,768 shows that as part of her computation she included the same 12 "Check" entries (totaling $50,479) that were reflected in Wilshire's 2008 general ledger as payments towards the $50,616 "Salaries Payable note" amount which petitioners had already

**[\*21]** included in their gross income (as part of the reported $162,749) on their 2007 return. Accordingly, this part of RA Johnson's computation was erroneous.[12]

As for petitioners' second reason, they offered no evidence to support it aside from Mr. Flume's self-serving testimony, which we find not to be credible. "As we have stated many times before, this Court is not bound to accept a taxpayer's self-serving, unverified, and undocumented testimony." Shea v. Commissioner, 112 T.C. 183, 189 (1999) (citing Tokarski v. Commissioner, 87 T.C. 74, 77 (1986)).

Accordingly, we sustain respondent's determination of additional wage income for the years at issue except to the extent of $57,289 ($107,768 – $50,479) for 2008.[13]

III.   Subpart F Income

With the enactment of the Revenue Act of 1962, Pub. L. No. 87-834, sec. 12, 76 Stat. at 1006, subpart F was added to the Code. Vetco, Inc. & Subs. v. Commissioner, 95 T.C. 579, 585 (1990). Under this statutory scheme, a U.S.

-----

[12]Respondent does not seek to change the timing of the wage income from 2007 to 2008.

[13]In the light of our holding we need not address respondent's alternative position as to the amounts distributed in excess of reported wages, i.e., that the amounts are additional dividend income to petitioners.

[*22] shareholder of a CFC must generally include in his gross income his pro rata share of the CFC's "subpart F income" for such year. Id. at 585-586; see sec. 951(a)(1). Section 951(b) defines a U.S. shareholder, with respect to any foreign corporation, as a U.S. person "who owns (within the meaning of section 958(a)), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote" of the foreign corporation. Section 957(a) generally defines a CFC as "any foreign corporation if more than 50 percent of--(1) the total combined voting power of all classes of stock of such corporation entitled to vote, or (2) the total value of the stock of such corporation, is [directly or constructively] owned * * * by United States shareholders on any day during the taxable year of such foreign corporation." Section 952(a)(2) defines subpart F income as including foreign base company income as determined under section 954. Under section 954(a)(1) and (c)(1), foreign base company income includes "foreign personal holding company income", which in turn includes dividends, interest, and the excess of gains over losses from the sale or exchange of certain property.

Respondent determined that petitioners had reportable subpart F income-- the investment income from Wilshire's UBS and Fidelity accounts--of $15,813,

**[\*23]** $35,150, and $17,778 for 2006, 2007, and 2008, respectively.  The dispute

with respect to this determination centers on whether Wilshire was a CFC on any

day during each of the years at issue with the result that if Wilshire was such a

CFC then petitioners have reportable subpart F income for those years.[14]  It is

respondent's position that Wilshire was a CFC (and thus petitioners had reportable

subpart F income in the aforementioned amounts) because each petitioner held a

50% ownership interest in Wilshire; petitioners, on the other hand, contend that

Wilshire was not a CFC (and thus they did not have any reportable subpart F

income) because they each only held no more than a 9% ownership interest in

Wilshire during the years at issue.

Petitioners' contention, however, that Wilshire was not a CFC is now

foreclosed by the doctrine of collateral estoppel, also known as issue preclusion.

Issue preclusion "recognizes that suits addressed to particular claims may present

issues relevant to suits on other claims."  Kaspar Wire Works, Inc. v. Leco Eng'g

& Mach., Inc., 575 F.2d 530, 535 (5th Cir. 1978).  "Issue preclusion applies when

suits involve separate claims, but present some of the same issues, and 'bars the

relitigation of issues actually adjudicated, and essential to the judgment, in a prior

---

[14]There is no dispute that for the years at issue each petitioner was a "United
States shareholder" as that term is defined in sec. 951(b).

[*24] litigation between the same parties.'" Midwest Mech. Contractors, Inc. v. Commonwealth Constr. Co., 801 F.2d 748, 751 (5th Cir. 1986) (quoting Kaspar Wire Works, Inc., 575 F.2d at 535-536); see also Cal. Cmtys. Against Toxics v. EPA, 928 F.3d 1041, 1051 (D.C. Cir. 2019); Brotman v. Commissioner, 105 T.C. 141, 147 (1995). Issue preclusion focuses on whether (1) the issue in the second suit is identical in all respects with the one actually litigated, decided, and essential to the judgment in the first suit, (2) a court of competent jurisdiction rendered a final judgment in the first suit, (3) the controlling facts and applicable legal principles in the second suit have changed significantly since the judgment in the first suit, and (4) there are special circumstances, such as fairness concerns, that warrant an exception to preclusion in the second suit. See Cal. Cmtys. Against Toxics, 928 F.3d at 1051-1052 (citing Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992)); Meier v. Commissioner, 91 T.C. 273, 283 (1988) (citing Montana v. United States, 440 U.S. 147, 155 (1979)).

In Flume v. Commissioner (Flume I), T.C. Memo. 2017-21, a collection due process case, the issue for decision was whether Mr. Flume was liable for assessed civil penalties under sections 6038 and 6679 for his failure to declare (via Forms 5471) his ownership interest in Wilshire for the 2001-09 taxable years (and his ownership interest in FFM for the 2001 and 2002 taxable years). In deciding the

**[*25]** issue, the Court had to determine whether Wilshire was a CFC for years that included the years at issue in the instant case. The Court determined that petitioners each held 50% ownership interests in Wilshire throughout a period that included the subject years. Id. at *13. The Court rejected as unavailing Mr. Flume's assertion that the two bearer shares of Wilshire's capital stock that gave him and Mrs. Flume each 50% ownership interests in Wilshire were eliminated and that the share ownership structure changed, reducing his (and Mrs. Flume's) ownership to 9% (each) for 2001-09. The Court concluded that "the backdated amended articles of association [which purportedly memorialized the ownership structure change as of April 12, 2001] and the absence of any evidence as to when or if the change in stock ownership actually occurred contradict * * * [Mr. Flume's] assertion."[15] Id. Accordingly, the Court held that Wilshire was a CFC for 2001-09. Id. at *14.

This case, like Flume I, requires us to determine whether Wilshire was a CFC for 2006-08. The Court in Flume I entered its decision on February 15, 2017,

---

[15]Specifically, the Court noted that the 50% ownership structure was retained up to a portion of 2005, when on October 18, 2005, Mr. Flume opened a UBS account on Wilshire's behalf using the original articles of association and copies of the two bearer shares. Flume I, at *14. The Court also noted that nothing in the record indicated a change in ownership for 2006-09 aside from Mr. Flume's incredible self-serving testimony and the backdated articles of association. Id.

**[*26]** and that decision is now a "final judgment". The controlling facts and applicable legal principles here have remained unchanged since the Court's decision in Flume I; indeed, the trial transcript from Flume I is a stipulated exhibit in this case. There are also no special circumstances (such as fairness concerns) that would warrant an exception to preclusion in this case. Accordingly, we hold that the conditions for issue preclusion are satisfied; Wilshire was a CFC during the years at issue.

As a consequence of our holding, petitioners were required, as indicated supra pp. 21-22, to report as gross income their pro rata share of Wilshire's subpart F income for the years at issue. Given that they were 100% shareholders of Wilshire for those years, then their pro rata share of Wilshire's subpart F income for those years was 100%. However, the pro rata amount that a U.S. shareholder of a CFC reports as subpart F income of the CFC for any taxable year cannot exceed the CFC's current earnings and profits. Sec. 952(c)(1)(A); Corcoran v. Commissioner, T.C. Memo. 1991-367, 1991 Tax Ct. Memo LEXIS 416, at *16; see also Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates & Gifts, para. 69.10, at *2 (Westlaw 2020) ("The purpose of subpart F to deny deferral of U.S. taxation never requires that U.S. shareholders of a CFC be taxed on amounts exceeding the dividends they would have received if

**[\*27]** all income had been distributed currently, and earnings and profits are the measure of dividend income.") A CFC's current earnings and profits are generally "determined according to rules substantially similar to those applicable to domestic corporations".[16] Sec. 964(a); see also sec. 1.964-1(a), Income Tax Regs. The examination report enclosed with the October 1, 2014, notice of deficiency to petitioners indicates that respondent computed Wilshire's current earnings and profits for each of the years at issue because petitioners did not provide such computations. To that end the examination report states that "[t]here was sufficient E&P in each year to cover the Subpart F distributions", and it sets forth Wilshire's current earnings and profits for each of the years at issue. The report indicates that Wilshire's current year earnings and profits for 2006 and 2007 were $465,357 and $97,473, respectively, but –$344,116 for 2008. Thus, for 2006 and 2007 petitioners' pro rata amounts of Wilshire's subpart F income ($15,813 for 2006 and $35,150 for 2007) did not exceed Wilshire's current year earnings and

---

[16]The Code does not define the term "earnings and profits" for domestic corporations. See sec. 316(a); Juha v. Commissioner, T.C. Memo. 2012-68, slip op. at 11 n.11 (citing Henry C. Beck Co. v. Commissioner, 52 T.C. 1, 6 (1969), aff'd per curiam, 433 F.2d 309 (5th Cir. 1970)). A domestic corporation's earnings and profits "is generally understood to equal the corporation's taxable income for the taxable year with certain modifications." Susan A. Johnston, Taxation of Regulated Investment Companies and Their Shareholders, Mechanics of Single-Tier Taxation, para. 3.04[2][b][i] & n.159; see also Eaton Corp. & Subs. v. Commissioner, 152 T.C. 43, 50 (2019).

**[\*28]** profits but for 2008 their pro rata amount of Wilshire's subpart F income ($17,778) did in fact exceed Wilshire's current earnings and profits. It appears then that respondent did not take into account (but should have) the section 952(c)(1)(A) limitation for 2008, with the result that petitioners should have no reportable subpart F income for 2008.[17] Accordingly, we sustain respondent's determination of reportable subpart F income for 2006 and 2007 but not for 2008.[18]

## IV.    Accuracy-Related Penalties

We now address whether petitioners are liable for accuracy-related penalties.

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(1) and (2), the underpayment is attributable to "[n]egligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." For

---

[17]We note that the subpart F income for 2008 that was not includable in petitioners' gross income is subject to recapture in a future year. See sec. 1.952-1(e)(3), Income Tax Regs.; see also Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates & Gifts, para. 69.10 (Westlaw 2020).

[18]In the light of our holding we need not address respondent's alternative position as to the interest income, ordinary dividend income, and capital gains attributable to Wilshire's UBS and Fidelity accounts, i.e., that this income is ordinary income to petitioners.

**[\*29]** these purposes, "negligence" includes "any failure to make a reasonable attempt to comply" with the internal revenue laws, "disregard" includes "any careless, reckless, or intentional disregard", and an understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return for that taxable year or $5,000.  Sec. 6662(c) and (d)(1)(A).

As indicated <u>supra</u> p. 16, the Commissioner bears the burden of production with respect to an individual taxpayer's liability for any penalty.  Sec. 7491(c).  In <u>Frost v. Commissioner</u>, 154 T.C. __, __ (slip op. at 20) (Jan. 7, 2020), we recently held that the Commissioner's initial burden of production under section 7491(c) includes producing evidence that he has complied with the procedural requirements of section 6751(b) and that once he has satisfied this initial burden the taxpayer must come forward with contrary evidence.  Section 6751(b)(1) requires that the initial determination of certain penalties be "personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."  <u>See</u> <u>Graev v. Commissioner</u> (<u>Graev III</u>), 149 T.C. 485, 492-493 (2017), <u>supplementing and overruling in part</u> <u>Graev v. Commissioner</u> (<u>Graev II</u>), 147 T.C. 460 (2016); <u>see also</u> <u>Clay v. Commissioner</u>, 152 T.C.  223, 248 (2019) (quoting section 6751(b)(1)).  In <u>Belair Woods, LLC v. Commissioner</u>, 154 T.C. __, __ (slip op.

[*30] at 24-25) (Jan. 6, 2020), we recently held that "the 'initial determination' of a penalty assessment * * * is embodied in the document by which the Examination Division formally notifies the taxpayer, in writing, that it has completed its work and made an unequivocal decision to assert penalties."

Trial of this case was held, and the record was closed, before we issued Graev III and overruled in part Graev II (and issued Clay, Belair Woods, and Frost). In the light of Graev III we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of section 6751(b) supervisory approval in the record and petitioners to respond. Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1) and filed a motion to reopen the record to offer into evidence (1) the declaration of Mr. Davis, (2) the May 1, 2014, 30-day letter to petitioners that was signed by Mr. Davis, along with RA Johnson's examination report that was (among other documents) enclosed with the 30-day letter, (3) the declaration of Ms. Moore, and (4) the Civil Penalty Approval Form that Ms. Moore signed on August 4, 2014, along with RA Johnson's "515 Workpapers" that the form references. Petitioners objected to the introduction of any additional evidence with respect to the penalties and requested that the Court deny respondent's motion.

**[*31]** Reopening the record for the submission of additional evidence lies within the Court's discretion. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971); Chieftain Int'l (U.S.), Inc. v. Se. Offshore, Inc., 553 F.3d 817, 820 (5th Cir. 2008); Cooley v. FERC, 843 F.2d 1464, 1473 (D.C. Cir. 1988); Butler v. Commissioner, 114 T.C. 276, 286-287 (2000); see also Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 363 (9th Cir. 1974) ("[T]he Tax Court's ruling [denying a motion to reopen the record] is not subject to review except upon a demonstration of extraordinary circumstances which reveal a clear abuse of discretion."), aff'g T.C. Memo. 1971-200. We will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. Butler v. Commissioner, 114 T.C. at 287; see also Chieftain Int'l (U.S.), Inc., 553 F.3d at 820 (explaining that trial courts, in deciding whether to allow a reopening of the record, should "weigh 'the importance and probative value of the evidence, the reason for the moving party's failure to introduce the evidence earlier, and the possibility of prejudice to the non-moving party'" (quoting Garcia v. Woman's Hosp. of Tex., 97 F.3d 810, 814 (5th Cir. 1996))); SEC v. Rogers, 790 F.2d 1450, 1460 (9th Cir. 1986) (explaining that the trial court "should take into account, in considering a motion to hold open

**[\*32]** the trial record, the character of the additional * * * [evidence] and the effect of granting the motion"), abrogated on other grounds by Pinter v. Dahl, 486 U.S. 622 (1988).

In reviewing motions to reopen the record, courts have considered when the moving party knew that a fact was disputed, whether the evidentiary issue was foreseeable, and whether the moving party had reason for the failure to produce the evidence earlier. See, e.g., George v. Commissioner, 844 F.2d 225, 229-230 (5th Cir. 1988) (and cases cited threat) (holding that refusal to reopen the case was not an abuse of discretion because the issue was foreseeable to the taxpayers and the court could see no excuse for the taxpayers' failure to produce evidence earlier), aff'g Frink v. Commissioner, T.C. Memo. 1984-669. We also balance the moving party's diligence against the possible prejudice to the nonmoving party. In particular we consider whether reopening the record after trial would prevent the nonmoving party from examining and questioning the evidence as it would have during the proceeding. See, e.g., Estate of Freedman v. Commissioner, T.C. Memo. 2007-61; Megibow v. Commissioner, T.C. Memo. 2004-41.

The evidence that is the subject of respondent's motion would not be cumulative of any evidence in the record and would not be impeaching material. Respondent bears the burden of production with respect to penalties and would

[*33] offer the evidence as proof that the requirements of section 6751(b)(1) have been met. The subject evidence is material to the issues involved in the case, and the outcome of the case as to the issue at hand will be changed if we grant respondent's motion.

Petitioners state without further explanation that whether they are liable for the section 6662(a) accuracy-related penalties for the years at issue "was raised at the trial * * * with all evidence presented at the time of trial." However, when this case was submitted and the record closed, Graev III (as well as Clay, Belair Woods, and Frost) had not been issued. We agree with respondent that the evidence he now wishes to have admitted into the record is not cumulative and is material to the penalty issue in this case. We also agree with respondent that the 30-day letter (along with the enclosed examination report) and the Civil Penalty Approval Form (along with the referenced "515 Workpapers") are records kept in the ordinary course of business activity and are authenticated by the respective declarations of Mr. Davis and Ms. Moore. We will admit these documents into evidence and the declarations for purposes of authentication under rule 902(11) of the Federal Rules of Evidence. See Clough v. Commissioner, 119 T.C. 183, 190-191 (2002).

[*34] We now must decide whether respondent's evidence is sufficient to satisfy his initial burden of production under section 6751(b)(1). See Frost v. Commissioner, 154 T.C. at __ (slip op. at 21). Consistent with our holding in Clay, the May 1, 2014, 30-day letter with RA Johnson's examination report embodied the initial determination--i.e., the first formal communication of the conclusion--that assertion of the section 6662(b)(1) and (2) penalties against petitioners for the years at issue were warranted. The record indicates that Mr. Davis reviewed RA Johnson's examination report and approved it by signing the 30-day letter on May 1, 2014, and then the letter was sent to petitioners later that same day. We hold that respondent has introduced evidence that written supervisory approval of the section 6662(b)(1) and (2) penalties was given before a formal communication of those penalties to petitioners and that the evidence is sufficient, as part of his initial burden of production under section 7491(c), to show that he complied with the procedural requirements of section 6751(b).

The burden now shifts to petitioners to offer evidence suggesting that written supervisory approval of the penalties was untimely--i.e., that there was a formal communication of the penalties before the proffered approval. See Frost v. Commissioner, 154 T.C. at __ (slip op. at 22). Petitioners have not claimed, nor does the record support a conclusion, that respondent formally communicated his

[*35] initial penalty determination to petitioners before May 1, 2014--the date that Mr. Davis signed the 30-day letter (that enclosed the examination report).  We therefore hold that the penalties here were approved in writing before the first formal communication to petitioners of those penalties.  See id. at __ (slip op. at 23) (citing Clay v. Commissioner, 152 T.C. at 249).

Respondent having complied with the requirements of section 6751(b)(1), we now turn to the remainder of his initial burden of production under section 7491(c).  Respondent's penalty position is that petitioners are liable for negligence penalties under section 6662(b)(1), or, in the alternative, substantial understatement penalties under section 6662(b)(2) for the years at issue.  Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one ground.  Sec. 1.6662-2(c), Income Tax Regs.  We need only address respondent's claim that petitioners are liable for substantial understatement penalties because he has provided sufficient evidence showing that petitioners' understatement of income tax for each of the years at issue exceeds the greater of 10% of the tax

**[\*36]** required to be shown on their joint Federal income tax returns for those

years or $5,000.[19]

Application of the substantial understatement penalty may be avoided with

respect to any portion of an underpayment if the taxpayer shows that he acted in

good faith with respect to such portion and that there is reasonable cause for such

portion.  See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. 438, 446-447

(2001).  The determination of whether there is reasonable cause and the taxpayer

acted in good faith depends upon the pertinent facts and circumstances of a

particular case.  Sec. 1.6664-4(b)(1), Income Tax Regs.  We consider, among other

factors, the experience, education, and sophistication of the taxpayer, and the

taxpayer's reliance on the advice of a professional.  Id.  Reasonable cause may

exist where the taxpayer relies on professional advice if the taxpayer proves by a

---

[19]Petitioners' income tax was understated by $9,384, $20,143, and $31,938 for 2006, 2007, and 2008, respectively; as determined in the October 1, 2014, notice of deficiency to petitioners, their understatements of income tax for the years at issue were substantial.  We note that petitioners' understatements of income tax for 2006 and 2008 remain substantial even after taking into consideration respondent's concession with respect to their wage income for 2006 and the issues we have decided in petitioners' favor for 2008.  We further note that respondent also demonstrated that petitioners acted negligently for the years at issue because the record before us clearly shows, see supra pp. 18-21, that petitioners failed to maintain books or records sufficient to accurately reflect their income (and substantiate their claimed NOLs), see sec. 1.6662-3(b)(1), Income Tax Regs. (providing that negligence includes any failure by a taxpayer to keep adequate books and records or to substantiate items properly).

[*37] preponderance of evidence that: (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him or her; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976) ("While a taxpayer's reliance upon his accountant to prepare accurate returns may indicate an absence of fraudulent intent, * * * this is true in the first instance only if the accountant has been supplied with all the information necessary to prepare the returns.").

Petitioners contend that they qualify for the reasonable cause defense because they hired a U.S. C.P.A. (i.e., Ms. Luna) to prepare and file their joint Federal income tax returns for the years at issue and they "reasonably relied on [her] regarding all of * * * [their] business entities", having disclosed "all information" to her. Their contention lacks merit. Simply employing a tax return preparer for the years at issue does not permit petitioners to avoid accuracy-related penalties. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. Furthermore, the record shows that Mr. Flume acknowledged that he did not know whether Ms. Luna had the necessary expertise to provide petitioners with U.S. tax

**[\*38]** advice and to prepare their joint returns for the years at issue.  Moreover, the record shows that petitioners in fact failed to provide Ms. Luna with complete information as Mr. Flume also acknowledged that Ms. Luna, in preparing these returns, did not know that they held ownership interests in any foreign corporation other than FFM and that they did not advise her that they had sole signature authority over foreign bank accounts, other than those held in Mexico, until sometime in 2008 (or 2009).  We therefore find that petitioners did not rely on Ms. Luna's "judgment" (let alone reasonably rely on her "judgment"), nor did they act in good faith.  Petitioners have failed to prove that they had reasonable cause within the meaning of section 6664(c).  Accordingly, we sustain respondent's determination regarding the accuracy-related penalties.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.